J. J. JONES v. J. D. WINSTEAD AND K. C. WAGSTAFF, ADMRS. OF J. W. WINSTEAD, DECEASED.

(Filed 28 November, 1923.)

1. **Bills and Notes — Negotiable Instruments — Evidence — Execution—Presumptions—Consideration—Mental Capacity.**

Where the execution of a negotiable instrument has been established in an action thereon, it is a rebuttable presumption that it had been given for a sufficient consideration, and that the maker had mental capacity to execute it, requiring the defendant, attacking its validity on these grounds, to disprove its validity by his evidence. C. S., secs. 3004, 3005, etc.

**2. Same—Appeal and Error—Objections and Exceptions—Demurrer.**

Where the maker of a negotiable instrument had been confined in an insane asylum twelve years before the execution of his note in suit, but since then had been actively and successfully handling his own large business affairs, the question as to presumption of insanity continuing, unless the contrary has been shown, so as to render the note invalid, should be by an exception to the refusal of a requested instruction to that effect, and not by motion as of nonsuit upon the evidence; but *held*, such a prayer, under the evidence in this case, should have been refused, the evidence being only of a circumstance tending to establish the defendant's position.

**3. Same—Past Consideration— Executory Promise—Contracts.**

Where one renders valuable services to another at his request, the law implies the latter's promise to compensate him for their reasonable value; and where the evidence is sufficient to show a mutual intent to this effect, a direct promise to pay, later made, is a sufficient consideration, and a note then given therefor is not objectionable as a promise to pay a past consideration without value received by the maker.

**4. Contracts—Services—Consideration—Evidence—Questions for Jury.**

Evidence of services rendered by plaintiff to his deceased uncle in the latter's lifetime, in looking after, collecting and disbursing the proceeds of his large crop of tobacco sold on warehouse floors, at his request, is sufficient of a consideration to support an action upon a note he had later given his nephew therefor.

**5. Same—Fraud.**

*Held*, in this case there was no valid objection to the adequacy of consideration given for the note sued on, in the absence of evidence of fraud or imposition sufficient to vitiate the contract.

CLARK, C. J., dissenting.

CIVIL ACTION, to recover on a promissory note for $4,000, given by intestate to plaintiff, and tried before *Devin, J.,* and a jury, at August Term, 1923, of PERSON.

Defendants answered and alleged that the note sued on was given without any consideration. Second, that when same was given, the intestate was without sufficient mental capacity to execute it. On the trial, plaintiff proved the due execution of the note, in form as follows:

"April 14, 1919. One year after date, I promise to pay J. J. Jones the full and just sum of $4,000 for value received of him. Interest, five per cent. (Signed) J. W. Winstead."

Defendant offered testimony tending to show that at the time of the execution of the note the intestate was not of sufficient mental capacity to execute the note; and, second, that the same, being executory, was without valuable consideration. In support of the first position, showed among other things that intestate had been three times, at different periods, confined in the insane asylums of the State, the last

time being twelve years before the note was given, and that since his discharge on the last occasion he had never been of sound mind or of capacity to execute the note sued on.

In reply plaintiff offered evidence tending to show that since coming from the State Hospital, twelve years ago, intestate had been in control and management of his own property; that he had a large landed estate, was a good trader, rented out. his property himself, and accumulated property; that the note had been executed by intestate in payment of services theretofore rendered by plaintiff to the intestate and in recognition of the claims plaintiff had upon him, and it appeared that the annual interest had been receipted for on the note as per agreement between plaintiff and intestate. The cause was submitted to the jury, and verdict rendered, as follows:

"1. Was the note sued upon executed without any consideration? Answer: 'No.'

"2. Was J. W. Winstead, at the time of the execution of the note, without sufficient mental capacity to execute same? Answer: 'No.'

"3. What amount is due on said note? Answer: '$4,000.' ".

Judgment on the verdict, and defendants excepted and appealed, assigning errors.

*Luther M. Carlton and William D. Merritt for plaintiff.*

*Brogden, Reade & Bryant, M. C. Winstead, and F. O. Carver for defendants.*

HOKE, J. The execution of the note, a negotiable instrument, having been duly proven, and same put in evidence, under our statutes and decisions applicable, there is a presumption that it was given for value, and the question of a lack of consideration is a matter of defense, the burden being upon the defendant to establish it. *Piner v. Brittain,* 165 N. C., 401, and authorities cited; C. S., ch. 58, secs. 3004 and 3006, etc. There is also a rebuttable presumption that the promissor was sane at the time of the execution of the note, and on that question the burden of showing the contrary, as a general rule, is upon the defendant or the person alleging it.

The court charged the jury generally in accord with these principles, submitting the opposing evidence under full and appropriate instructions, and referring to the fact of defendant's confinement in the asylums of the State, and his condition while there, as circumstances tending to establish defendant's position. Under these instructions the jury have rendered their verdict for plaintiffs, and, after careful consideration, we can find no valid reason for disturbing the results of the trial.

It is very earnestly contended by defendants that, on the entire evidence, if believed by the jury, including that of plaintiff himself, the note was without any valuable consideration, and his Honor should have so ruled, in accord with their prayer for instructions to that effect. On that question plaintiff, a witness in his own behalf, testified. among other things that plaintiff, at the time of the execution of the note, and for some time prior thereto, was engaged in the sale of tobacco as employee of a warehouse company at South Boston, Va.; that intestate, owning a large body of land in this State, having numbers of tenants thereon, was in the habit of sending the tobacco grown on his farms to South Boston for sale, and not infrequently, pursuant to intestate's request, by note or otherwise, plaintiff would look after these sales and the disposition of the purchase price, following in such matters defendant's directions given him. Speaking more directly to the execution of the note and the circumstances attending its execution (admitted without objection), the witness said:

"He came over to South Boston one day, and I was busy in the office, and he came in there and told me he wanted to see me, and we went out in the warehouse and sat down on a truck, and he told me that I had been nice to him in South Boston. Lots of times he would send tobacco. Some of his tenants would come over and sometimes sell with me; and if he did not come himself, he would phone me or write me a letter and tell me what to do with the check, and sometimes he would say let one have so much and send me a check for the rest, and I always did just as he told me. He told me he appreciated what I had done for him; that Uncle Charles, who had died a few years ago, did not leave me anything, as he did some of the rest of his people, and he wanted to help me, and I had been nice to him, and he appreciated what I had done for him, and he was going to give me this note. He said, 'I may pay you the money for this before I die,' but he said, 'I am getting to be an old man and I do not know when I will die.' But he said, 'If I die before I pay it, my estate will be worth it, and I want you to collect it.' And that is what I am trying to do. He asked me to credit the interest on this note, and he asked me to send him a receipt, and I sent it to him, and he asked me did I credit the interest after I sent him the first receipt; and he was over there some time later and asked me did I credit it on the note, and I told him I did."

Again, on cross-examination, witness testified as follows: "I was engaged in the warehouse business for somebody else. He did not sell much tobacco with me. He owned some stock in the Independent Warehouse, and I think his people sold more there than anywhere else. But he did sell some at the other warehouses. He did not sell so much tobacco with me, but if he wasn't coming himself he would usually

write me or get somebody to phone me, and he would tell me who was coming and what warehouse they were going to be at, and tell me what he wanted done—if he wanted to let them have anything, and what to do with the other."

"Q. As a matter of accommodation to him, you did as he requested? A. Yes, sir.

"Q. He did sometimes sell tobacco at your warehouse? A. Yes, sir.

"Q. Of course, when he sold tobacco at your warehouse, if he wanted you to do something with the money, you would do it? A. Yes, sir."

On this, the evidence chiefly pertinent, it is insisted for appellant that the facts only present an executory promise to make compensation for a "past consideration," and that the same does not constitute value within the meaning of the exception. It is said by Professor Page, in his valuable work on contracts: "At modern law, the term 'past consideration' means that a right has been acquired or forborne, under circumstances that either never created any legal liability, to pay therefor, or if there was a legal liability originally, subsequent facts have amounted to a discharge. It does not, of course, mean that a promise may not be supported by a prior legal liability as a consideration, whether absolutely valid, voidable, or subject to some subsequent defense. It does not include cases in which the consideration is a legal liability which arose before the promise was made, and upon which the promise is based. Such forms of consideration are sufficient. As used in this sense, a past consideration is no consideration, at modern law, in most jurisdictions." Page on Contracts (2d Ed.), sec. 625.

It will be observed that the evidence all shows that the services in the instant case were rendered by request, and some of the old English decisions, and probably some in this country, seem to be to the effect that wherever services are done by request of another this will import a sufficient consideration. But these decisions, so far as examined, were cases where a request was necessary to create liability, and, on the facts presented, did create it; and a more careful examination of the principle as pertinent to the facts of the instant case will show, in accord with the above citation, that the question properly depends on whether the present executory promise to pay was given for services formerly rendered, and under circumstances which created a legal liability. In such case the services, though at a former time, will suffice as a valid consideration for the subsequent promise, and this in turn usually depends on whether the services were given and received without expectation of pay. In *Winkler v. Killian,* 141 N. C., at p. 578, the Court, in speaking to the general principle involved, said: "It is ordinarily true that where services are rendered by one person for another, which are knowingly and voluntarily accepted, without more, the law presumes that such

services are given and received in expectation of being paid for, and will imply a promise to pay what they are reasonably worth. This is a rebuttable presumption, for there is no reason why a man cannot give another a day's work as well as any other gift, if the work is done and accepted without expectation of pay."

And in one of the cases cited and relied on by defendants (*Harper v. Davis, Admr.,* 115 Md., 349), it is held, among other things, as stated in report of case in 35 L. R. A. (N. S.), 1026: "A note given by a man to a stranger in blood, who entered his family and lived there as a daughter, having all the privileges of any member of the family, the past services, which were rendered without any intention on her part of charging for them, or on his part of making compensation for them, is without consideration, and cannot be enforced by the payee."

Considering the facts in evidence in view of these decisions and the principles they approved and illustrate, it appearing that the services were rendered by request, that they were of a kind ordinarily importing liability and that the intestate in acknowledgment of their value subsequently gave to plaintiff the note sued upon, this being a relevant circumstance showing his concept of the matter, we think it a permissible inference that the services were not given and accepted as a gratuity, but under circumstances that established a legal and enforceable liability which required that the case be submitted to the jury, and the court could not have instructed the jury, as requested, that no valuable consideration had been shown.

Defendants except further that, it having been made to appear that the intestate had been confined on three different occasions in the asylums for the insane, the court should have instructed the jury that there was a presumption that the conditions then presented were presumed to continue, whereas these facts were only submitted as circumstances tending to show insanity. It might be a sufficient answer to this exception that there was no prayer for instruction as a basis for this exception, but on the record we are of opinion that the same could not have been properly given. It is true that when insanity has been shown to exist as an habitual or permanent condition there may arise a rebuttable presumption that the same will continue, but the position, in our opinion, does not apply here, because the evidence does not establish the requisite data, and because the fact in question, occurring twelve years after the intestate's last discharge from the asylum, is too remote for a proper application of the principle referred to, and more especially when there are facts in evidence tending to show further that since his last discharge the intestate has exercised general supervision and control of his business affairs and been successful in their management. *Hudson v. Hudson,* 144 N. C., 449-454; Lawson on Presumptive Evidence, 227.

Nor is there any valid objection for inadequacy of consideration, in the absence of any allegation or evidence of fraud or imposition vitiating the contract. *Institute v. Mebane,* 165 N. C., 644-650; 6 R. C. L., title Contracts, sec. 85.

On consideration of the entire record, we are of opinion that no reversible error has been shown, and the judgment is therefore affirmed.

No error.

CLARK, C. J., dissenting: This action is on a note for $4,000, purporting to have been executed by defendants' intestate. The defendants' intestate died in April, 1922. He lived alone at his home in Person County, doing his own cooking and house work a part of the time. He was three times an inmate of the Hospital for the Insane. The first time, some twenty-five years before his death, he was taken to the hospital at Morganton for treatment, and was an inmate for twelve months. Some years later he was again an inmate of the same institution. About ten or eleven years before his death he was an inmate of the State Hospital at Raleigh for about six months. He was never discharged from that institution, but his brother brought him home on leave, and he never returned. From that time until his death he continued to live alone at his home. He was exceedingly "close" in money matters, but at times had a sort of mania for giving notes and making offers of financial assistance among his relatives. He gave at sundry times in this way several notes to his relatives, and among others offered to give a nephew $5,000 and a brother a note for $10,000. These offers, in most cases, were refused, because it was well known in the family that the intestate was of insane or feeble mind, and there was a tacit understanding that none of them would take advantage of his situation. Even among those who accepted the notes, none of them have presented any of such notes for payment, except this plaintiff, a nephew.

On 4 April, 1919, the defendants' intestate gave the plaintiff a note for $4,000, not under seal, saying to him that he had been nice to him and he appreciated it. He further told the plaintiff to credit the interest on the note as it fell due, as if it had been paid, and send him a receipt for it. The administrators refused to recognize the note as a valid obligation of the estate.

It would seem very clear, upon the facts of this case, that the estate of the intestate should not be subjected to the payment of this note. Among the errors assigned are: The court charged the jury that "the burden of proof was on the defendants to satisfy them by the greater weight of the evidence that at the time of signing the note in controversy the intestate did not have sufficient mental capacity to execute the note." Generally speaking, this is a correct proposition of law, but

under the evidence in this case the burden of proving mental capacity should have been cast upon the plaintiff who asserted it. It is not denied that the defendants' intestate was treated at the hospital at Morganton on two occasions—the first about twenty-five years before his death, and that about ten or eleven years before his death he was taken to the State Hospital at Raleigh, where he remained about six months, and was never discharged as cured, but was permitted to accompany his brother home on leave. His brother testified as follows: "He was not discharged as being cured. I wrote the doctor and asked him to let my brother come home, as he kept writing me that he wanted to come home, and the doctor refused, unless I would come down. The doctor told me that he would not discharge my brother, but would let me take him home." This evidence was uncontradicted. The intestate was, therefore, under a legal adjudication of being insane, and was not discharged by the authority of the physician, but, being allowed to go home, he simply did not come back. Upon this testimony the burden was upon the plaintiff to prove by the greater weight of the evidence that the deceased had recovered and that he had sufficient mental capacity to execute the note.

When insanity is once shown to exist, there is a presumption that it continues, unless there is testimony showing the restoration of mental soundness, the burden of which is upon him to assert it. *Beard v. R. R.,* 143 N. C., 140; *Weedman's Estate,* 254 Ill., 504.

This $4,000 ought not to be a burden upon the estate unless it was shown by the greater weight of the evidence that the intestate's mental capacity was sufficient to authorize the jury to find that his mental condition had been restored.

There was no evidence whatever of a consideration for this or the other notes which the deceased at times would scatter around liberally, and which all had refused to profit by, except this nephew. There was evidence of slight kindnesses or exchange of courtesies between the deceased and this nephew, but no evidence of any substantial "service" justifying an obligation to pay the plaintiff $4,000. The court erred in charging that "these services, though they were past consideration, would be sufficient consideration for the note if they were of valuable consideration." This was an expression of opinion by the judge that there had been services rendered.

The appellant, in apt time and in writing, requested his Honor to charge the jury as follows: "The court charges you that if you believe the testimony of the plaintiff, J. J. Jones, there was no consideration for the note sued on, you will therefore answer the first issue 'Yes.' " Upon the inspection of the testimony it was error in the court to refuse to so charge. The defendants in apt time also requested his Honor to

charge the jury, "if they believed the evidence they would answer the first issue 'Yes.'" It was error to refuse to give this instruction, for there is no testimony that could have justified the jury in finding that there was any legal consideration.

Past services may constitute a sufficient consideration to support a note, provided they are such services, rendered under such circumstances, as to create a legal obligation to pay for them, but the evidence in this case totally failed in this respect.

It was also error to allow the plaintiff to testify as to the alleged acts of kindness upon which he asserted his claim that this note for $4,000 was given for a sufficient and valid consideration. The testimony of the plaintiff was incompetent under C. S., 1795 (formerly C. C. P., sec. 343, and Code of 1883, sec. 590), which provides: *"A party to a transaction excluded when the other party is dead.* Upon the trial of an action, on the hearing upon the merits of a special proceeding, a party or person interested in the event . . . shall not be examined as a witness in his own behalf or interest . . . against the executor, administrator, etc., of a deceased person except when the executor, administrator, etc., is examined in his own behalf . . . *concerning the same transaction or communication,"* and the administrators did not testify as to such "transaction or communication."

The testimony of the plaintiff in this case was admitted as follows: "Mr. Winstead executed the note for $4,000 to me. He came over to South Boston one day, and I was busy in the office, and he came in there and told me he wanted to see me, and we went out in the warehouse and sat down on a truck and he told me that I had been nice to him in South Boston. Lots of times he would send tobacco; some of his tenants would come over and sometimes sell with me, and if he did not come himself he would phone or write me a letter to tell me what to do with the check, and sometimes he would say let one have so much and send him the check for the rest, and I did just as he told me. He told me he appreciated what I had done for him. That Uncle Charles, who died a few years ago, did not leave me anything as he did some of the rest of his people, and he wanted to help me, and I had been nice to him and he appreciated what I had done for him and he was going to *give* me this note." Again he says: "He told me I had never bothered him about anything and never had borrowed money from him. He said some of the rest had, and he felt like he wanted to do something for me, and I was named after him, and he appreciated what I had done for him over there."

On cross-examination the plaintiff testified further: "I was engaged in the warehouse business for somebody else. He did not sell much tobacco with me. He owned some stock in the Independent Warehouse,

and I think his people sold more there than anywhere else, but he would sell some at other warehouses. He did not sell so much tobacco with me, but if he was not going himself he would usually write to me or get some one to phone me, and he would tell me who was coming and what warehouse they were going to sell at, and tell me what he wanted done. If he wanted to let them have anything, and what to do to the others."

He testified further on cross-examination:

"Q. As a matter of accommodation to him, you did as he requested? A. Yes, sir.

"Q. He did sometimes sell tobacco at your warehouse? A. Yes, sir.

"Q. Of course, when he sold tobacco at your warehouse, if he wanted you to do something with the money you would do it? A. Yes, sir."

The plaintiff's case on the issue of consideration must stand or fall by this testimony.

In this there is nothing to raise a legal obligation on the part of the deceased, and nothing whatever to indicate that the plaintiff at the time of the services rendered, if they can be called services, expected to be paid, or that the defendants' intestate expected to pay for them.

If the plaintiff expected to be paid he does not say so in this testimony. If the defendants' intestate considered himself under any obligation to pay, he failed to say so to the plaintiff when he gave this note. The words "pay" or "remunerate" were never used. He said he wanted to "help" the plaintiff and to "do something for him." These so-called services were merely little acts of courtesy which are usually performed between people having business relations or between whom there are other ties. What warehouseman or what merchant would expect to be paid $4,000 for such little matters as the plaintiff testified he did as a matter of "accommodation" to the deceased? The plaintiff was a clerk in a public warehouse, and the deceased occasionally sold or sent tobacco there, and they were nearly related.

The plaintiff was given by the court free rein to testify concerning the entire transaction, and he did not say or indicate that the deceased was under obligation to pay him anything.

K. C. Wagstaff testified that he was a nephew of the deceased and one of the administrators. That he saw the deceased two or three times a year. "I do not think the mental capacity of the deceased has been good since he went to the asylum for the last time. For the past three, four, or five years I do not think he was capable of transacting business in a business-like way; he was capable of transacting it in some way." He further said that after he and J. D. Winstead (brother of deceased) had qualified as administrators they "went to the house occupied by the deceased and found money scattered about over the house in different places, in corners, cracks, and barrels. We found about $900. He had

35—186

a stock of merchandise there. Most of it was found in bolts of cloth or drawers where he kept thread. The whole stock of merchandise was not worth much. I reckon he had part of it 25 years. The cloth and things were rotten and no good at all. We found two checks, as I remember—one to Mr. Oscar Carter and one to some company off somewhere. One of the checks was 25 or 30 years old and the other five or six years old. We found chattel mortgages given him by his tenants. He wrote most of them himself. We found none of them recorded and none of them witnessed much, and some witnessed at the wrong place—in pretty bad condition. I do not think we found but one recorded mortgage, and that was one that had been transferred to him. You could not tell how much some of them were for. Some of them we could." There was much other evidence of mental incapacity.

The defendant Wagstaff further testified that the plaintiff "did not mention the note to me that day. I saw him several times after that. Saw him at South Boston once after that, and talked with him two hours. We were talking about the estate and I hoped he would mention the note to me, but he never did. He has never mentioned it since then. The first notice came through the bank."

John D. Winstead, the other defendant, testified that he was a brother of the deceased, and one of his administrators, and that the plaintiff is his nephew. He testified as to his brother being in the hospital at Morganton twice, and that on the third time he was taken to Raleigh about twelve years ago. That he was not discharged as being cured but that as he kept writing him he wanted to come home he went down to Raleigh, and "the doctor told me that he would not discharge my brother but that he would let me take him home. He died at the age of 75 years."

He further testified: "For 25 years I looked after some part of his business, and for the last five or six years Emory, a nephew of mine, looked after part of it. I told the deceased I would not look after all of it. From the time I brought him home from the hospital the last time, in my opinion, he did not have sufficient mental capacity to transact business intelligently. This statement is based upon a transaction I had with him. He offered to give me a note for $10,000. I think I could have gotten one for $20,000 if I had asked him for it. I told him I would not have it."

This defendant testified that the plaintiff was employed in the warehouse as a clerk, but neither he nor the other defendant gave any testimony whatever in regard to the transaction or conversation between the plaintiff and the deceased upon which the entire claim of the plaintiff rests, and his testimony as to which was therefore entirely incompetent under the statute, C. S., 1795.

This witness and others testified as to the lack of mental capacity on the part of the deceased. He further testified that there were fifteen heirs at law, and that between 1919 and the date of intestate's death the plaintiff never spoke to him about this note, and nothing was said about it until the notice came through the bank some time after his brother's death.

Upon the testimony in the case, it was error for the judge to say to the jury that the deceased, who had been three times an inmate of the asylum, and who on the last occasion left the asylum without any discharge, was presumed to be sane, and that the burden was upon the administrators of the estate to prove that he was not.

Upon the evidence, also, it was error to charge the jury that the little incidents which the plaintiff, though incompetent to testify to, had narrated were "services" which, "though they were past consideration, would be sufficient consideration for the note if they were of valuable consideration." The plaintiff was incompetent to testify as to such matters, but, conceding that objection was not made on that ground, still the alleged "services" he testified to were not sufficient consideration upon which to justify a verdict against the estate of the deceased for $4,000.

It was also error for the court to refuse to charge the jury as follows: "Where two men enter into a contract, the law does not ordinarily inquire into the adequacy of the consideration, but where the consideration is so grossly out of proportion to the amount of the alleged obligation, and is so obviously inadequate as to shock the conscience and the sense of justice, the law will not enforce the contract; and the court, therefore, charges you that if you shall find from the evidence, and from the greater weight thereof, that the plaintiff rendered the deceased service in consideration of the note, but if you shall further find by the greater weight of the evidence that the value of such service was so out of proportion to the amount of the note and demand by the plaintiff as to shock the conscience of people of average intelligence, you will answer the first issue 'Yes.' "

The burden of proof was on the plaintiff as the note was not under seal, to prove consideration, and the burden was also upon the plaintiff to prove that he was of sufficient mental capacity to assume the liability of $4,000; and it was error to tell the jury upon the evidence that the burden was on the defendants to rebut the presumption of sanity.